**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUN WEST MORTGAGE CO., INC., | Case No. 8:22-cv-01700-MRA-AS |
| Plaintiff, | **FINDINGS OF FACT AND** |
| v. | **CONCLUSIONS OF LAW** |
| FIRST NATIONAL BANK OF | |
| PENNSYLVANIA, | |
| Defendant. | |

This matter is before the Court following a three-day bench trial that began on November 4, 2024. Scott Gizer and Padideh Zargari appeared for Plaintiff Sun West Mortgage Company, Inc. Michael Blumenfeld, Meredith Storm, and Ryan Cosgrove appeared for Defendant First National Bank of Pennsylvania. At the trial's conclusion, the Court ordered the parties to submit revised written proposed findings of fact and conclusions of law. The parties submitted their respective proposed findings. ECF 85, 86.

Having considered the testimony presented at trial, the exhibits admitted into evidence, the parties' stipulated facts, and the arguments of counsel, as presented at trial and in the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.   <u>FINDINGS OF FACT</u>[1]

### A.   *The Parties*

Plaintiff Sun West Mortgage Company, Inc. ("Sun West") is a mortgage company that offers a variety of mortgage-related products, including mortgage servicing and Home Equity Conversion Mortgage ("HECM") reverse mortgages.  FPTCO ¶¶ 1-2.  Defendant First National Bank of Pennsylvania ("FNB") is the successor to Howard Bank, which was acquired by FNB on or around February 4, 2022.  *Id.* ¶ 3.  Howard Bank was a successor to First Mariner Bank d/b/a 1st Mariner Bank ("First Mariner"), a Maryland chartered trust company.  *Id.* ¶ 4.

### B.   *The Settlement Agreement Between Sun West and First Mariner*

In 2011, First Mariner, as predecessor to FNB, transferred to Sun West the servicing rights for a portfolio of approximately 2,200 reverse mortgage loans owned by the Federal National Mortgage Association ("FNMA").  FPTCO ¶ 5; Day 1 Tr. at 30:13-21, 61:15-24; Exs. 9, 10, 16.

On August 6, 2015, Sun West filed a Complaint against First Mariner in the U.S. District Court for the Central District of California, Case No. 2:15-CV-05982, relating to the transfer of servicing rights as to the portfolio ("First Mariner Litigation").  FPTCO ¶ 6.  On May 16, 2017, Sun West and First Mariner settled the First Mariner Litigation and entered into a settlement agreement (the "Settlement Agreement")."  *Id.* ¶ 8; Ex. 16.  Loan Number #xxxxxx4089 (the "Barner Loan") and Loan Number #xxxxxx0145 (the "Hastings Loan") are among the 2,200 reverse mortgages covered by the Settlement Agreement.  FPTCO ¶¶ 12, 13.  The Hastings and Barner Loans are at issue in this trial.  *Id.* ¶ 11.

//

---

[1] The transcript for day 1 of the trial (November 4, 2024) is cited to as "Day 1 Tr." *See* ECF 82.  The transcript for day 2 (November 5, 2024) is cited to as "Day 2 Tr." *See* ECF 79.  The transcript for day 3 (November 6, 2024) is cited to as "Day 3 Tr." *See* ECF 80.  The Final Pretrial Conference Order, which contains the parties' stipulated facts, is cited to as "FPTCO." *See* ECF 59.

Paragraph 2 of the Settlement Agreement states, in relevant part:

Subject to the terms of Section 4, infra, Sun West does . . . hereby unconditionally remise, release, and forever discharge [First Mariner] . . . from any and all claims, actions, causes of action . . . and demands of whatever kind or nature that Sun West ever had, now have, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause, or thing, whether known or unknown and whether suspected or unsuspected, from the beginning of the world to the date of this Agreement arising out of, connected with, or relating to the subject matter of this Lawsuit, including . . . the Serviced Loans, and any and all servicing activities related to the Serviced Loans.

FPTCO ¶ 9; Ex. 16 ¶ 2. Paragraph 4 of the Agreement states, in relevant part:

In the event that Sun West is required to re-purchase or provide indemnification with respect to any of the Serviced Loans by [FNMA], Ginnie Mae, or any other purchaser or assignee (or any of their respective designees) of the Serviced Loans . . . and the re-purchase or indemnity demand relates to or arises out of [First Mariner's] (or another third party's) solicitation, processing, origination, underwriting, funding and/or closing of a Serviced Loan, Sun West shall provide notice of such demand to [First Mariner] within 10 business days of the date on which the obligation is imposed on Sun West. Said notice shall include a copy of the instructional notice given to Sun West to repurchase or indemnify with respect to the Serviced Loan(s). Upon receipt of said notice, [First Mariner] shall have 21 days to re-purchase or indemnify with respect to the Serviced Loan(s).

FPTCO ¶ 10; Ex. 16 ¶ 4. As such, pursuant to Paragraph 4 of the Agreement, FNB was required to repurchase from Sun West certain reverse mortgage loans that were originated by First Mariner, serviced by Sun West, and delivered to FNMA (the "Serviced Loans"). Day 2 Tr. at 203:10-17; Ex. 16 ¶ 4.

Paragraph 4 of the Agreement also provides:

Sun West, however, agrees in good faith to pass through to [First Mariner] any relief made available to [Sun West] by [FNMA], Ginnie Mae, or any other purchaser or assignee . . . of the Serviced Loans in connection with its

administration and enforcement of repurchase or indemnification requests relating to the Serviced Loans.  In the event that Sun West does not notify [First Mariner] of any such re-purchase or indemnity demand within 10 business days as described above, Sun West hereby waives its right to assert a claim for indemnification from [First Mariner] in connection with the re-purchase or indemnity demand for such Serviced Loan(s).

FPTCO ¶ 10; Ex. 16 ¶ 4.

Paragraph 12 of the Agreement binds successors of the parties to the Agreement. Day 1 Tr. at 31:5-9; FPTCO ¶ 14; Ex. 16 ¶ 12.  FNB is the successor to First Mariner's obligations under the Settlement Agreement.  Day 1 Tr. at 31:5-9; Day 2 Tr. at 76:8-13; Ex. 16.

### C.    Home Equity Conversion Mortgages

The Barner and Hastings Loans are HECM reverse mortgages, a type of reverse mortgage that is insured by the Federal Housing Administration ("FHA") within the United States Department of Housing and Urban Development ("HUD")."  Day 1 Tr. at 24:15-20, 94:17-19, 95:25-96:1.  Private lending institutions can be approved to underwrite FHA loans under HUD's Direct Endorsement Program.  Day 2 Tr. at 138:12-16.

Before closing, a Direct Endorsement ("D.E.") Underwriter carefully reviews all aspects of a loan file—including the credit appraisal, credit report, income documentation, and the title commitment—to determine whether the loan meets HUD's reverse mortgage guidelines and is therefore insurable.  Day 1 Tr. at 106:14-107:23; Day 2 Tr. at 138:21-139:20; Day 3 Tr. at 6:25-7:6.  It is reasonable for an underwriter to rely on a clean title commitment when originating a reverse mortgage.  Day 3 Tr. at 10:7-10; Day 2 Tr. at 49:10-16, 52:8-11.

Sun West's expert witness, H. Marc Helm, is not a D.E. Underwriter.  Day 2 Tr. at 17:1-2. Sun West's corporate representative, Sydney Fernandez, is not a D.E. Underwriter. Day 1 Tr. at 106:11-12.  FNB's expert witness, West Beibers, and FNB's corporate representative, Mick Rizzo, are both D.E. Underwriters and were the only D.E. Underwriters to testify at trial.  Day 2 Tr. at 138: 5-7; Day 3 Tr. at 6:8-23.

### D.    *Federal National Mortgage Association Repurchase Demands*

Loan Quality Connect ("LQC") is FNMA's online platform for communicating with loan servicers, also known as "responsible parties," regarding information for loans that have been selected for quality control reviews, including action items such as missing or defective information and repurchase demands. Day 2 Tr. at 147:2-9, 147:17-25. Only "responsible parties" (servicers such as Sun West) or a sub-servicer approved to act on behalf of a responsible party for a particular loan can submit a written appeal of an FNMA repurchase demand through LQC. Day 1 Tr. at 79:12-17; Day 2 Tr. at 170:2-11.

FNMA's determination in a repurchase demand that a loan defect is "uncorrectable" or that that of which it complains is a defect may be appealed. Day 2 Tr. at 174:20-175:15, 176:9-17; Ex. 115 at 5. In the event the appeal results in a determination that there is no defect or that the defect is correctable, FNMA's guidelines provide that the initial demand for a servicing remedy will be considered withdrawn and, if applicable, FNMA will issue a notice of servicing defect, allowing the seller/servicer to correct the defect during the servicing correction period set forth in the notice. Day 2 Tr. at 174:20-175:15, 176:9-17; Ex. 115 at 5. If a lender/servicer does not appeal FNMA's repurchase demand within the allotted time frame, it has no further right to challenge FNMA's repurchase demand or continue with the management escalation process. Day 2 Tr. at 173:15-24, 237:20-238; Ex. 115 at 8.

### E.    *The Barner Loan*

First Mariner originated the Barner Loan on February 13, 2008, and issued the same to June P. Barner. Day 1 Tr. at 60:25-61:14; Exs. 64, 65. First Mariner prepared the First Deed of Trust and the legal description benefitting First Mariner to real property located at 8015 Mandan Road #101, Greenbelt, Maryland 20770 (the "Barner Property")." Day 1 Tr. at 60:25-61:14; Ex. 65. Stewart Title Guaranty Company ("Stewart") issued a clean title commitment and title policy for the Barner Property without exception. Day 1 Tr. at 109:24-110:12; Ex. 67. The Barner Loan was insured by HUD at the time of its origination. Day 2 Tr. at 140:6-24; Day 3 Tr. at 9:25-10:6.

In or around 2009, the Barner Loan was sold to FNMA, but First Mariner retained the servicing rights.  Day 1 Tr. at 25:24-26:14.  In June 2011, First Mariner assigned and transferred the Barner Loan servicing rights to Sun West.  Ex. 10 at 1.

In or around November 2018, as part of the foreclosure process, Sun West ordered a 20+ year title search of the Barner Property, which revealed two judgment liens filed against June S. Barner in favor of the State of Maryland in 2002 for unpaid taxes.  Day 2 Tr. at 163:25-164:11; Exs. 76, 105 at 94-95.  On November 27, 2018, Sun West, as the insured under the Stewart policy, tendered a claim to Stewart to address the two liens.  Day 1 Tr. at 64:10-17; Ex. 18.  On December 13, 2018, Stewart responded to Sun West's tender and offered to issue a letter of indemnity in favor of the title insurance underwriter that issues a policy to the third-party purchaser of the Barner Property at a foreclosure sale.  Day 1 Tr. at 64:24-65:11; Ex. 77.

Sun West's servicing notes reflect that by early 2019, Sun West was aware that it had several options for resolving the Barner Loan title issue, including but not limited to paying off the tax liens.  Day 1 Tr. at 133:23-134:4; Ex. 105 at 113-116.  On December 5, 2019, Sun West contacted the Comptroller of Maryland to verify the liens and obtain a payoff amount.  Day 1 Tr. at 66:24-67:22; Exs. 79, 105 at 139.  The payoff amount for the 2002 tax liens was approximately $25,000.00.  Exs. 79, 105 at 139.  After receiving the payoff amounts, Sun West did not pay the tax liens or request that Howard Bank pay the liens.  Day 1 Tr. at 138:20-139:6; Day 2 Tr. at 153:19-25, 161:13-18; Day 3 Tr. at 14:16-24.  Sun West's corporate representative, Sydney Fernandez, testified at trial that the liens would have gone away if Sun West had paid them at that time.  Day 1 Tr. at 138:20 – 139:6.

On November 15, 2020, June Barner died, triggering an event of default.  Day 2 Tr. at 164:5-11; Ex. 136.  On April 7, 2021, Sun West sued Stewart in the Circuit Court for Prince George's County, Maryland, alleging that the 2002 tax liens prevented Sun West from conveying clear title to the Barner Property in a foreclosure sale and requesting that

the Court order Stewart to pay to Sun West the total amount due and owing under the 2002 tax liens.  Ex. 21.

While the Stewart litigation remained pending, on or around September 20, 2021, Sun West self-reported to FNMA that the Barner Loan had a defective title and FNMA's lien was not in first position due to the existence of the two senior tax liens.  Day 1 Tr. at 72:8-18; Day 2 Tr. at 166:13-16, 167:2-10; FPTCO ¶ 34; Ex. 24.  Soon thereafter, on September 29, 2021, Sun West's General Counsel, Stephen Ma, informed Joseph Howard, Senior Vice President and General Counsel for Howard Bank, of the state tax liens and the Stewart litigation.  Ex. 25.  Sun West further provided a copy of the Stewart complaint, which attached the Comptroller of Maryland's payoff as an exhibit.  *Id*.  Sun West's letter asked Howard Bank to take immediate action to either mitigate this issue or be prepared to repurchase the loan.  *Id*.

In June 2021, Stewart had moved to dismiss the complaint in the lawsuit.  FPTCO ¶ 33; Ex. 22.  On November 17, 2021, the Court granted the motion to dismiss the complaint without prejudice.  FPTCO ¶ 35; Ex. 28.

On December 16, 2021, in response to Sun West's self-report, FNMA issued an Initial Resolution Request ("IRR") to Sun West stating in pertinent part:

> [FNMA's] analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below [. . . ] At least one of the defects listed below was determined to be a servicing repurchase defect and/or was deemed to be uncorrectable.  The subject loan was delivered as a first lien transaction.  It has come to our attention that there were tax liens placed against the borrower January 10, 2002 and October 31, 2002. Per Maryland law, these liens attach to the assets, including real property.  As the tax liens are in first lien position, the loan was ineligible for delivery to [FNMA].

Day 1 Tr. at 76:4-19; Ex. 32 at 4.  The IRR stated that Sun West, as the "responsible party," must resolve the matter by February 14, 2022, in one of two ways: either (1) appeal the

decision to repurchase in written form through LQC or (2) repurchase the Barner Loan. Day 1 Tr. at 76:4-9, 72:5-18; FPTCO ¶ 28; Exs. 24, 32 at 3-4.

On December 23, 2021, Mr. Ma emailed Joseph Howard, serving notice under Paragraph 4 of the Settlement Agreement by advising Howard Bank of FNMA's repurchase demand to Sun West, attaching the same, and demanding that Howard Bank repurchase the Barner Loan. Day 1 Tr. at 76:4-19; Day 2 Tr. at 96:17-97:24; Ex. 32 at 1. Sun West explained that FNMA had identified certain defects with the Barner Loan that were deemed to be uncorrectable since the Barner Loan deed of trust was not in first lien position at origination. Day 1 Tr. at 76:4-19; Ex. 32 at 1.

On direct examination at trial, Sydney Fernandez testified that Sun West did not appeal the repurchase demand because (1) FNB had not communicated as to "how they wanted to appeal the case, and so there was never an argument provided to Sun West to submit to Fannie Mae," and (2) Sun West had "no reasonable argument to make" since the tax liens took priority over FNMA's lien. Day 1 Tr. at 80:2-12. But the evidence at trial and Mr. Fernandez's own further testimony discredit this factually.

In an email dated February 3, 2022, Mr. Howard (in relevant part) informed Mr. Ma that Howard Bank would be finalizing its merger with FNB the following day and that he would no longer be with the company. Ex. 43 at 2. He also stated that "FNB has indicated that it will appeal the Barner loan." *Id*. On February 4, 2022, Howard Bank merged with FNB. FPTCO ¶ 3.

On February 11, 2022, Michael Blumenfeld ("Mr. Blumenfeld"), counsel for FNB, attempted to directly appeal FNMA's Barner Loan repurchase demand by emailing FNMA. Ex. 46. In an email dated the same day (February 11, 2022), Mr. Blumenfeld informed Mr. Ma that he had notified FNMA of FNB's position and specifically directed Mr. Ma (on behalf of Sun West) to file a formal written appeal of FNMA's repurchase demand as to the Barner Loan through LQC on or before February 14, 2022, and explained FNB's reasoning behind the appeal: that FNB believed the liens were federal tax liens and, absent

a filed/recorded notice that such lien had been asserted, they lacked priority. Day 1 Tr. at 80:21-81:17; Exs. 43 at 1, 48 at 3.

Mr. Blumenfeld followed-up with Mr. Ma via email on February 14, 2022, and once again requested that Sun West file a formal written appeal of FNMA's repurchase demand through LQC. Ex. 48 at 2. In response, Mr. Ma advised Mr. Blumenfeld that Sun West had "already notified FNMA of FNB's position regarding the Barner Loan" and had requested an extension of FNMA's repurchase deadline until March 15, 2022. *Id.*

On February 17, 2022, in response to Mr. Blumenfeld's February 11, 2022, email, FNMA forwarded Mr. Blumenfeld's email to Sun West and directed Sun West to upload the appeal into LQC. Ex. 46. Sun West did not upload the appeal into LQC as FNMA instructed. Day 1 Tr. at 79:22-80:1.

Importantly, by February 17, 2022, the 2002 tax liens had been satisfied at no expense to Sun West and Sun West's title to the Barner Property was free and clear. Day 1 Tr. at 84:15-25; Day 2 Tr. at 106:24-107:12; Ex. 105 at 193. However, Sun West did not inform FNB of this fact. Day 2 Tr. at 60:2-5. Sun West also did not seek on its own to appeal FNMA's repurchase demand on this basis. Day 2 Tr. at 107:1-12.

On March 15, 2022, the deadline for Sun West to repurchase the Barner Loan or appeal FNMA's repurchase demand passed without Sun West filing a formal appeal on behalf of FNB. Day 1 Tr. at 77:19-78:6.

Mr. Fernandez confirmed at trial that only Sun West as the servicer could have filed the appeal, that no appeal was filed with respect to the Barner Loan, that Sun West never told FNB that it would not be filing an appeal, that he did not know why Sun West did not notify FNB about not filing the appeal but that it "[p]robably just got missed," and that "[Sun West] should have probably informed [FNB], but [he didn't] know what happened." Day 1 Tr. at 79:12-82:2, 153:11-23. On cross-examination, Mr. Fernandez further testified that Sun West never communicated to FNB that it disagreed with FNB's grounds for appeal. Day 1 Tr. 153:19-21.

FNMA did not rescind its IRR. Day 2 Tr. at 72:20-73:14. Sun West remained obligated to FNMA for the repurchase of the Barner Loan in the amount of $141,663.64, which it paid. Day 1 Tr. at 87:25-88:9, 158:6-20, 227:18-232:18; Exs. 51, 53, 54, 55, 56. Sun West sold the Barner Property to a third party via a short sale that closed on or about April 14, 2022, from which Sun West received $127,242.58. Day 1 Tr. at 43:7-25, 82:8-83:20, 86:13-24; Exs. 52, 53, 105. Sun West never advised FNB that it was in the process of selling the Barner Property, even though the sale was initiated around December 2021. Day 2 Tr. at 177:15-178:4; Ex. 31. As of November 4, 2024, the total payoff amount on the Barner Loan due from FNB to Sun West was $179,843.69. Day 1 Tr. at 89:19-23; FPTCO ¶ 15; Exs. 16, 61.

Sun West did not submit a mortgage insurance claim to HUD. Day 2 Tr. at 178:5-180:3; Ex. 57. Mr. Fernandez testified at trial that, due to the origination defects, the loan was not insurable, and HUD would not have insured the loan; therefore, it would have amounted to "claim fraud" to make a claim on such a loan. Day 1 Tr. at 96:2-16. FNB presented credible evidence at trial, however, that an unknown defect at a loan's origination does not necessarily make the loan uninsurable by HUD, so long as the defect is corrected once it is discovered. Day 2 Tr. at 151:21-152:18, 174:6-19; Day 3 Tr. at 11:25-12:4.

A servicer may initiate a claim with HUD on behalf of a lender/investor under certain circumstances, including, but not limited to, when the short sale proceeds are insufficient to satisfy the debt. Day 1 Tr. at 231:25-232:15. Filing a claim for mortgage insurance benefits with HUD allows a HECM lender/servicer to recoup the shortfall incurred upon default. Day 1 Tr. at 25:11-21; Day 2 Tr. at 179:12-16, 194:15-19. As a result of Sun West's failure to submit a claim to HUD, Sun West (and FNB) did not attempt to recoup losses it incurred through the default and sale of the Barner Loan. Day 1 Tr. at 25:11-21; Day 2 Tr. at 179:12-23. FNB has not repurchased the Barner Loan or indemnified Sun West for the loan. FPTCO ¶¶ 27, 37; Exs. 60, 61.

//

//

-10-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.    The Hastings Loan

On or about March 10, 2009, First Mariner originated the Hastings Loan and issued the same to Helen R. Hastings.  Day 1 Tr. at 32:2-18; Ex. 68.  The Hastings Loan is secured by a First Deed of Trust benefitting First Mariner and a Second Deed of Trust benefitting the Secretary of HUD to real property located at 34623 Christanna Highway, Blackstone, Virginia 23824 (the "Hastings Property").  Ex. 68; Ex. 75 at 75.  In April 2009, Chicago Title Insurance Company ("Chicago Title") issued a clean title commitment and title policy for the Hastings Property.  Ex. 70.  First Mariner prepared the Hasting's Deed of Trust and utilized the legal description prepared by Chicago Title.  Day 1 Tr. at 32:2-18; Ex. 68.  In or around 2009, the Hastings Loan was sold to FNMA, but First Mariner retained the servicing rights.  Day 1 Tr. at 25:24-26:14.  In June 2011, First Mariner assigned and transferred the servicing rights to Sun West.  Day 1 Tr. at 30:13-21; Ex. 9.

In or around March 2013, Helen Hastings died, triggering an event of default.  Day 1 Tr. at 25:3-10; Ex. 124-3.  On October 8, 2013, Charles Hastings, one of Ms. Hastings' heirs, via legal counsel, sent a letter to Sun West's counsel, alleging that Sun West's lien on the Hastings Property was not enforceable because the property line ran through the residential structure and the legal description on the Deed of Trust only encumbered a portion of the property, the garage.  Day 1 Tr. at 34:6-25; FPTCO ¶ 16; Ex. 11; Ex. 124 at 20.  Sun West internally investigated and contracted with outside counsel to investigate the issue, confirming the deficiency.  Day 1 Tr. at 35:1-11.

On April 27, 2015, Sun West, as the insured under the Chicago Title Policy, submitted a claim to Chicago Title to resolve the cloud on title.  Day 1 Tr. at 36:23-37:11; FPTCO ¶ 17; Ex. 13.  Around the same time, on May 8, 2015, Sun West self-reported the deficiencies in the Hastings Deed of Trust to FNMA.  Day 1 Tr. at 37:12-38:0; 214:1-9; Ex. 14.

On September 30, 2015, by way of a boundary line adjustment, Charles Hastings attempted to correct the issue with the Hastings legal description.  Ex. 75 at 52-54.  On or around February 2, 2016, a property appraiser informed Sun West that the Hastings septic

system was likely encumbering another lot.  Day 2 Tr. at 183:12-15; Ex. 124 at 158.  The septic system issue arose after First Mariner originated the Hastings Loan.  Day 2 Tr. at 64:2-12, 184:0-185:7; Day 3 Tr. at 17:13-18:8.  Sun West's servicing notes reflect that by March 2016, Sun West was considering making a repurchase demand to First Mariner for the Hastings Loan.  *See*  FPTCO ¶¶ 18-20; Ex. 15 at 1.

On February 6, 2018, Sun West filed a Complaint in the Circuit Court for Brunswick County, Virginia (Case No. CL18-42, "*Sun West v. Hastings*") regarding the Hastings Property boundaries and the effect of the legal description on Sun West's lien, requesting an order from the Court regarding the validity and priority of its Deed of Trust.  Day 1 Tr. at 38:21-39:10, 176:1-177:1; Exs. 17, 75; FPTCO ¶¶ 21-22.  On August 12, 2019, the Court issued an order ruling that the Deed of Trust was "valid and enforceable" and that its instrument "constitutes a first priority lien deed of trust" upon the Hastings Property.  Ex. 19.

The servicing notes for the Hastings Loan show that Sun West tried to liquidate the Hastings Property on behalf of FNMA in the open market in August 2020 but was not able to do so.  Ex. 124 at 283; *see also* Day 1 Tr. at 44:23-45:2.  Consistent with this evidence, the servicing notes reflect that FNMA was not satisfied that the legal description issue had been completely resolved.  Day 1 Tr. at 40:10-42:25.  In July 2021, FNMA Title Specialist Monica Guadagno emailed Sun West asking for an update on the legal description.  Ex. 23.  The email indicated this was a second request for an update.  *Id.*  In September 2021, FNMA requested from Sun West copies of the loan origination appraisal and prior title policy, which Sun West quickly provided.  Exs. 26 and 27.

On November 4, 2021, Sun West received an IRR from FNMA regarding the Hastings Loan, stating in pertinent part:

> [FNMA's] analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below [. . . ]

Incorrect Legal Description (Origination)

It has come to our attention that the legal description on the recorded security instrument for the subject transaction was incorrect at origination. [. . .]  An attempt was made to correct the issue, but the plat does not completely enclose the area and the ownership of the area is in question as the plat shows it to be a part of the neighboring tax parcel 4-13.

Ineligible Property – Utilities

[FNMA's] Selling Guide guidelines requires property utilities to meet community standards, be adequate, be in service and be accepted by community residents. A survey dated 7/29/2015 revealed that the well and pump house is not on the parcel encumbered by the mortgage.  The subject property must have the right to access them and have a legally binding agreement for their access and maintenance.  Also, no septic tank and drain field is shown on the subject property.  As no agreement has been located for use by the subject property, the loan was not eligible for delivery to [FNMA].

Ex. 29 at 4.  The IRR stated that by January 3, 2022, Sun West, as the "responsible party" for the Hastings Loan, must resolve the identified issues in one of two ways: either (1) provide an appeal to FNMA's decision in written form through LQC or (2) be prepared to repurchase the loan.  Day 1 Tr. at 45:23-46:3; FPTCO ¶ 23; Exs. 29 at 4, 83.

On November 23, 2021, 12 business days after Sun West received FNMA's IRR, Mr. Ma, on behalf of Sun West, emailed a letter to Mr. Howard, on behalf of Howard Bank, as predecessor to FNB, advising Howard Bank of FNMA's repurchase demand to Sun West, attaching the same, and asking whether Howard Bank wished to appeal FNMA's decision.  Ex. 29.  Mr. Ma's letter served as written notice of Sun West's demand that Howard Bank repurchase or indemnify Sun West regarding the Hastings Loan under Paragraph 4 of the Settlement Agreement.  Day 1 Tr. at 49:8-14; Ex. 29 at 2.  The letter stated that Sun West "anticipate[s] that *another Repurchase Demand* will be issued by [FNMA] in or around January 3, 2022."  Ex. 29 at 1.

At the request of Howard Bank, Sun West obtained a first extension of FNMA's January 3, 2022, appeal/repurchase deadline contained in the IRR.  Day 1 Tr. at 49:15-

51:2; Day 1 Tr. at 50:7-9; Exs. 30, 34; FPTCO ¶ 25; Ex. 34.  On or around January 10, 2022, Howard Bank, in cooperation with Sun West, obtained another extension from FNMA on the IRR.  The extended deadline was February 2, 2022.  Day 1 Tr. at 50:7-9; FPTCO ¶ 25; Ex. 34.

Unsatisfied that the legal description issues had been resolved, on January 18, 2022, FNMA filed a lawsuit in the Circuit Court for Brunswick County, Virginia (Case No. CL22-25) against the neighbors of the Hastings property to correct remaining errors in the legal description.  Ex. 37; Day 1 Tr. at 209:22-25.  The complaint described Sun West's prior litigation and attached the court order in the *Sun West v. Hastings* matter as Exhibit D.  Ex. 37 at 3; Day 1 Tr. at 216:12-217:12.  At trial, Mr. Howard testified that Sun West did not inform Howard Bank about FNMA's ongoing lawsuit or Sun West's prior lawsuit, and that knowledge of these lawsuits would have affected Howard Bank's decision to repurchase the Hastings Loan.  Day 2 Tr. at 111:1-114:4.  The evidence shows that Mr. Howard asked for the survey for the Hastings property and the eligible property utilities paragraph, which Sun West provided to him.  Day 3 Tr. at 116:10-117:3.  Mr. Howard did not request any other information.  *Id.*; Day 2 Tr. at 231:7-23.

On February 1, 2022, Sun West (Blanca Hoskins) emailed FNMA agreeing to repurchase the Hastings Loan.  Day 1 Tr. at 198:21-199:19; Day 2 Tr. at 114:11-23; Ex. 41.  On February 3, 2022, Joseph Howard sent an email to Sun West, in which he clearly stated that Howard Bank would repurchase the Hastings Loan, and that "FNB had requested repurchase numbers directly from FNMA prior to initiating the wire."  Ex. 43 at 2;  Day 2 Tr. at 86:13-23.  Mr. Rizzo testified that FNB was aware of this correspondence and did not object.  Day 2 Tr. at 226:11-21.  Mr. Fernandez confirmed that Sun West communicated to FNMA that it would repurchase the loan before Mr. Howard sent the email confirming that Howard Bank would repurchase the loan.  Day 1 Tr. at 198:9-199:22.

On February 10, 2022, Sun West provided FNB with a payoff demand from FNMA for the Hastings Loan which was good through March 5, 2022.  FPTCO ¶ 26.  On February 11, 2022, FNB's counsel, Mr. Blumenfeld, communicated to Sun West that FNB

understood the repurchase amount was good through March 5, 2022, and that FNB was "reviewing the loan file and the documentation provided" and would "confirm [its] next steps shortly." Ex. 48 at 3. On March 3 and 4, 2022, FNB requested that Sun West file an additional request for an extension with FNMA through LQC for repurchase of the Hastings Loan. Ex. 48 at 1. Mr. Blumenfeld stated in his email to Mr. Ma that "[he] [didn't] think it [would] be logistically possible to satisfy today's deadline" due to "Howard and FNB only recently complete[ing] their closing (February 5)." Ex. 48 at 1. Mr. Ma responded on March 4, 2022, stating that "Sun West ha[d] submitted a request to Fannie Mae for a further extension on its March 5, 2022, repurchase deadline," but "Sun West ha[d] not yet received a response from Fannie Mae . . ." *Id.* On March 5, 2022, FNMA's deadline to repurchase the Hastings Loan expired, and FNB did not repurchase the loan from FNMA. Day 1 Tr. at 52:12-25, 57:2-10; FPTCO ¶ 27; Ex. 42.

On March 16, 2022, Sun West repurchased the Hastings Loan from FNMA for $402,385.88. Day 1 Tr. at 55:11-58:15; Exs. 33 at 2, 86, 132, 133. FNB has not indemnified Sun West for the repurchase amount. FPTCO ¶ 27. As of November 4, 2024, the total payoff amount on the Hastings Loan due from FNB to Sun West was $497,701.65. Day 1 Tr. at 57:24-58:13; Ex. 60.

Sun West did not submit a mortgage insurance claim to HUD for the Hastings Loan. Day 1 Tr. at 66:19-24; Day 2 Tr. at 178:5-180:3; Ex. 57. Mr. Fernandez testified that doing so would have been tantamount to making a fraudulent claim because of the loan's origination defects. Day 1 Tr. at 94:23-95:23. Both Mr. Rizzo and Mr. Biebers from FNB admitted the issues with the septic tank and utilities that were caused by the 2015 survey could not have occurred had the legal description in the Hastings Deed of Trust been complete at the time of origination. Day 2 Tr. at 223:19-225:18; Day 3 Tr. at 31:12-35:24. It was only because the Deed of Trust did not encumber the entirety of the Hastings' collateral that they were able to record the 2015 survey without Sun West's consent. Day 2 Tr. at 225:8-14; Day 3 Tr. at 31:12-35:24. Sun West has not been able to sell the Hastings Loan. Day 1 Tr. at 43:7-45:2.

## II.   **CONCLUSIONS OF LAW**

### A.   ***Breach of Contract***

The elements of a breach of contract cause of action are: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1230 (2023).

The first element of this claim is met. Sun West and FNB agree that they were parties to a valid and enforceable contract—the Settlement Agreement.

The Court addresses the other elements of this claim with respect to each loan.

*First*, with respect to the **Barner Loan**, Sun West failed to produce evidence sufficient to satisfy the second element of this claim against FNB. Sun West did not do all, or substantially all, of the significant things the Settlement Agreement (a contract) required it to do, and there is no excuse for its nonperformance.

First Mariner originated the Barner Loan without knowledge of any title defects, including tax liens, as evidenced by receiving a title commitment and title insurance. FNB complied with its obligations under the terms of the Settlement Agreement by directing Sun West to appeal FNMA's repurchase demand findings through LQC. Sun West violated Paragraph 4 of the Settlement Agreement by failing to pass through to FNB the relief made available to it by FNMA (*i.e.*, the right to file an appeal) in connection with FNMA's enforcement of its repurchase demand. Sun West knew it was the only party permitted to appeal FNMA's repurchase request. FNB explicitly directed Sun West to file an appeal on February 11, 2022, and February 14, 2022. Sun West improperly refused and never informed FNB that it did not file the appeal or why it decided not to appeal.

The reason provided by Sun West for its nonperformance—that it believed at the time that any appeal lacked merit because the 2002 tax liens were state liens, not federal liens—is insufficient and unpersuasive. Even if the Court were to fully credit Mr. Fernandez's testimony that Sun West believed this information at the time, or that Sun

-16-

West's assessment was correct (*i.e.*, that the appeal lacked merit), Sun West did not *communicate* its disagreement to FNB. Paragraph 4 of the Settlement Agreement does not allow Sun West to make unilateral decisions like this; rather, Sun West was obligated to pass through any relief made available to it in good faith, which it did not do. That the 2002 tax liens had been satisfied at no expense to Sun West and Sun West's title to the Barner Property was free and clear as of February 17, 2022, further demonstrates a lack of good faith on the part of Sun West to give FNB the opportunity to appeal the repurchase demand on this related or separate basis. FNB's witnesses credibly testified that this information would have been relevant to any appeal. Based on these facts, there was no excuse for Sun West's unilateral decision not to appeal the repurchase demand pursuant to Paragraph 4 of the Settlement Agreement.

Thus, all of the conditions required for FNB's performance did not occur and were not waived and/or excused. Sun West caused its alleged damages and ultimately failed to prove by a preponderance of the evidence that FNB breached the Settlement Agreement as to this loan.

*Second*, as for the **Hastings Loan**, Sun West produced evidence sufficient to show that it substantially performed under the Settlement Agreement. Paragraph 4 of the Settlement Agreement requires Sun West to make demand upon FNB within 10 business days of FNMA imposing an obligation on Sun West to repurchase a loan, to include a copy of FNMA's instructional notice with the demand, and to pass on any relief available to FNB during the 21-day period in which FNB must respond to Sun West's demand. FNMA issued an IRR to Sun West for the Hastings Loan that required Sun West to either repurchase the loan or appeal FNMA's decision. Sun West in turn notified Howard Bank and obtained at least two extensions of the deadline to repurchase or appeal. On February 3, 2022, Howard Bank, through Joseph Howard, agreed to repurchase the loan. As explained below, Sun West did not waive any rights to enforce the Settlement Agreement based on the date it sent the notice to repurchase or appeal to FNB.

As to the third and fourth elements of a breach of contract claim, FNB never repurchased the loan, thus breaching the Settlement Agreement. As of November 4, 2024, Sun West suffered $497,701.65 in damages—the payoff amount—due to FNB's failure to repurchase the Hastings Loan. Accordingly, Sun West has met its burden to show that FNB breached the Settlement Agreement as to this loan.

### B. *Breach of Implied Covenant of Good Faith and Fair Dealing*

"The [implied] covenant of good faith and fair dealing [is] implied by law in every contract." *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (quoting *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010)). "The covenant is read into contracts and functions 'as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'" *Id.* (quoting *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992)).

As discussed above, Sun West and FNB were parties to a valid and enforceable contract—the Settlement Agreement. Sun West did not do all, or substantially all, of the significant things the Settlement Agreement (a contract) required it to do with respect to the Barner Loan. However, Sun West did all, or substantially all, of the material things that the Settlement Agreement required it to do with respect to the Hastings Loan. Thus, FNB has not acted fairly and in good faith by refusing and failing to repurchase the Hastings Loan. As of November 4, 2024, Sun West suffered $497,701.65 in damages due to FNB's breach of the Settlement Agreement.

### C. *Defendant's Affirmative Defenses*

With respect to the Hastings Loan, FNB raises only the following affirmative defenses: (1) failure to mitigate damages; (2) laches; (3) release; (4) waiver; and (5) estoppel. *See* ECF 86 at 20-24. All other affirmative defenses therefore have been waived or abandoned.

### 1.    Failure to Mitigate Damages

To establish failure to mitigate damages, Defendant has the burden of proving: (1) that Plaintiff failed to use reasonable efforts to mitigate damages; and (2) the amount by which damages would have been mitigated. *See* Ninth Circuit, Manual of Model Civil Jury Instructions, sect. 5.3; *see also Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015).

At trial, Sun West provided evidence it made significant efforts to prevent further damage associated with the Hastings Loan, as follows:

    a. Sun West immediately began investigating the nature of the defects when it learned of them.

    b. Sun West tendered a claim to its title insurer, which was rejected.

    c. Sun West filed a lawsuit against the heirs of the Hastings Property to cure the legal description errors.

    d. Sun West tried to liquidate the Hastings Property after foreclosing on FNMA's behalf, but the defects at issue prevented a sale.

    e. Sun West did not submit a claim to HUD because of the loan's origination defects, which it determined made the loan uninsurable.

Based on the above, the Court finds that Sun West used reasonable efforts to mitigate its damages. And FNB has not established or meaningfully argued the amount by which damages would have been mitigated if Sun West had taken other steps to mitigate.

### 2.    Laches

"Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (quoting *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) (McReynolds, J., dissenting)). "To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Id.* (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1082 (9th Cir. 2000)).

FNB argues that Sun West's claims are barred by the doctrine of laches. However, "[u]nder California law, laches is available as a defense only to claims sounding in equity, not to claims at law." *Wyler Summit P'ship v. Turner Broadcasting Syst., Inc.*, 235 F.3d 1184, 1193 (9th Cir. 2000) (citing *Wells Fargo Bank, N.A. v. Bank of America NT & SA*, 32 Cal. App. 4th 424 (1995)). A breach of contract claim is an action at law, not equity, and so the doctrine of laches is inapplicable. *See Wyler Summit P'ship*, 235 F.3d at 1193–94 (holding that breach of contract claim seeking money damages was an action at law that precluded defense of laches).

In regard to Sun West's Breach of the Covenant of Good Faith and Fair Dealing claim, FNB must establish, by a preponderance of the evidence, that Sun West unreasonably delayed the filing of this lawsuit, and FNB was prejudiced as a result. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001). Sun West did not unreasonably delay the filing of this lawsuit – it was filed within a year of FNB's breach. Further, there is no evidence the passage of this short period of time prejudiced FNB by, for example, resulting in the loss of evidence (often the prejudice invoked in support of a laches defense). *See Maguire v. Hibernia Sav. & Loan Soc.*, 23 Cal. 2d 719, 736 (1944).

### 3. Release

To establish a "release" defense, Defendant must prove: (1) a clear and unambiguous release; (2) that the release does not violate public policy; and (3) that the injury at issue reasonably relates to the release's object or purpose. *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 (9th Cir. 2012); *see also Diamond v. Schweitzer*, 110 Cal. App. 5th 866 (2025).

FNB's contention that Sun West "released" any claims with respect to the Hastings Loan ignores the terms of the Settlement Agreement. The release provisions of Section 2 expressly state that they are "Subject to the terms of Section 4…" ("RE-PURCHASE DEMANDS") and the releases in Section 2 do not release any of First Mariner's obligations under the Settlement Agreement. Section 4 obligates First Mariner and its successors to repurchase loans from Sun West that Sun West is obligated to repurchase

-20-

from FNMA.  It is undisputed that at the time the Settlement Agreement was executed, Sun West had not received any request by FNMA to repurchase the Hastings Loan and, thus, that obligation was not released based on the express terms of Sections 2 and 4.  Rather, the IRR was not received until 2021.

### 4.    Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988); *see also Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006).  The burden is on the party claiming waiver of a right to prove it by clear and convincing evidence; any doubt will be decided against waiver.  *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995)).

Here, FNB's attempt to apply the waiver defense is dependent upon the terms of the Settlement Agreement.  That is, FNB argues that Sun West did not adhere to the condition precedent in Paragraph 4 of the Settlement Agreement and has expressly forfeited its right to require FNB to repurchase the Hastings Loan.  For the reasons discussed above, it cannot be said that Sun West waived its rights under the Settlement Agreement with respect to the Hastings Loan since it substantially complied with the condition precedent, FNB was not prejudiced by any late notice, and FNB agreed to repurchase the Hastings Loan despite any alleged waiver.

While FNB claimed the notice for the Hastings Loan was late, the Court finds there is little merit to this claim.  FNMA's IRR was sent on November 4, 2021, and Sun West delivered notice to FNB in a November 23, 2021, letter.  Accordingly, 12 business days had lapsed between FNMA's IRR and the November 23, 2021, letter.  All witnesses acknowledged at the time of the IRR that there was no obligation for Sun West to repurchase the Hastings Loan as Sun West had the option to appeal.  *See* Day 1 Tr. at 45:25-47:2; 75:18-76:3, Ex. 84; Day 2 Tr. at 173:6-12, 204:5-13.  Consistent with this testimony, at no point prior to this litigation did Howard Bank, FNB or its counsel claim the notice

for the Hastings Loan was untimely. Day 1 Tr. at 218:6-19. The conduct of the parties prior to a dispute arising is instructive when interpreting a contract. *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.,* 74 Cal.App.4th 1232, 1242 (1999). Accordingly, contrary to FNB's contentions, Sun West substantially complied with the condition precedent and did not intentionally relinquish its right to seek repurchase or indemnification from FNB under the Settlement Agreement.

### 5.    Estoppel

"To establish a defense of estoppel, 'a party must show that the adverse party, either intentionally or under circumstances that induced reliance, engaged in conduct upon which [the relying party] relied and that the relying party acted or changed [its] position to [its] detriment.'" *European Motorcars, Ltd. v. Desert European Motorcars, Inc.*, No. EDCV 11-197 RSWL (DTBx), 2011 WL 3809933, at *3 (C.D. Cal. Aug. 25, 2011) (internal citations omitted)). More specifically, the party asserting the defense must show: "1) the party to be estopped must be apprised of the facts; 2) that party must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; 3) the other party must be ignorant of the true facts; and 4) he must rely upon the conduct to his injury." *Wells Fargo Bank v. Goldzband*, 53 Cal. App. 4th 596, 628 (1997) (quoting *Morrison v. Cal. Horse Racing Bd.*, 205 Cal. App. 3d 211, 217 (1988)).

FNB contends that Sun West, in its communications with Howard Bank/FNB regarding repurchasing the Hastings Loan, omitted material information relating to both FNMA's allegations—namely, that the boundary issue FNMA identified had been litigated and resolved in Sun West's favor—and Sun West's agreement to repurchase the Hastings Loan from FNMA. But Sun West did provide to FNB documents it requested after it succeeded Howard Bank, and FNB did not establish that the Settlement Agreement imposed any affirmative obligations to provide more than a copy of the IRR to Howard Bank, which Sun West did. In addition, Mr. Howard acknowledged Sun West mentioned it took steps to correct the Hastings Loan, but either never asked what those steps were, or,

if he did ask, he could not remember having had the discussion with Sun West's counsel. FNB's assertion that Sun West was somehow hiding documents from FNB is unavailing. At trial, Mr. Howard admitted he could not recall anything he asked for from Sun West which he did not receive. Mr. Rizzo testified he asked Sun West for the entire servicing file for both loans to FNB even before the instant lawsuit was initiated and received both. All of the information FNB claimed was omitted from them was provided in the servicing files. Thus, even though Sun West had no contractual obligation to do so, the Court finds that Sun West provided all the information requested by FNB in good faith.

As for Sun West's agreement to repurchase the Hastings Loan from FNMA prior to FNB's repurchase decision, FNB failed to establish that it would have acted differently—chosen to appeal instead of to repurchase—had it known that Sun West had agreed to repurchase the loan two days prior. FNB also failed to establish how it was injured because of not knowing this information since it never requested to appeal the repurchase demand – it simply requested an extension of the repurchase deadline consistent with its decision to repurchase the loan.

//
//
//
//
//
//
//
//
//
//
//
//
//

### III. **RELIEF**

The Court finds that Sun West has suffered the following damages as of November 4, 2024: the payoff balance of the Hastings Loan, which was $497,701.65.

Consistent with and within five (5) days of this Order, the Court orders Plaintiff to submit a proposed judgment, including the updated payoff balance on the Hastings Loan.

The Court also directs the parties to submit additional briefing of no more than 10 pages within fourteen (14) days of this Order concerning each party's entitlement to attorneys' fees and costs pursuant to Paragraph 21 of the Settlement Agreement. Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys' fees, and expenses for litigation between the parties arising out of the non-performance of any obligation under the Settlement Agreement. FPTCO ¶ 15; Ex. 16 ¶ 21.

**IT IS SO ORDERED.**

Dated: July 3, 2025

HON. MONICA RAMIREZ ALMADANI
UNITED STATES DISTRICT JUDGE